Title Agency, Inc. v. United States is Mr. Holstead. Please come forward. Okay, this is case number 162158, Northwest Title Agency, Inc. v. United States. When you're ready, Mr. Holstead. Thank you, Your Honor. Wayne Holstead for Northwest Title Agency. May it please the Court, I would like to try to focus the argument by highlighting two comments made at page 9 in the appellee's brief as they characterize the argument. The first, this was characterized as a contract with HUD and Northwest Title to provide closing services to home buyers purchasing homes from HUD. The second is that the issue is that we were not to be allowed to charge fees for a second time. The first comment is simply not true. We were not contracting with HUD to provide services for home buyers. We contracted with HUD to provide services for HUD. HUD was the seller of property. Sales and purchases are two identifiable parts of the transaction. There is nothing in the solicitation. There is nothing in the original contract. There is nothing in the course of conduct or how the Northwest Title closed 10,000 transactions over a period of two years with HUD. They were allowed to charge some fees to buyers in 10,000 transactions. What kind of fees was Northwest Title allowed to charge? I gather in what, two of the three or maybe all three places, title insurance, you did charge? Yes, that's a good start at breaking down. The government doesn't contend that you couldn't charge for title insurance, right? They never did. The statement that the contract is clear that you could charge for title insurance. The contention has been that we couldn't charge buyers any fees. I don't think the government has ever contended that you couldn't charge for title insurance, right? Well, they always allowed us to. They don't now contend that you couldn't charge for title insurance? Yes. We were allowed to contract directly with purchasers and charge them some fees. Was any part of your $4 million request a request for damages for inability to sell title insurance to buyers? No, it is not. What about the title search? That is to me the most critical issue because the contracts were interpreted differently. Minnesota and Wisconsin, we were allowed to charge for title searches. Title searches and exams are a necessary component of preparing title insurance. But there is some suggestion that you can have two different kinds of title search. One if you are going to get insurance and that is a more thorough one. Exactly. And a less thorough one if you are not getting the insurance, right? Exactly. And what were you not allowed to charge for? The more thorough search? In Missouri. The more thorough search? In Missouri, we were not allowed to charge for the more thorough search, which is a significant portion of our damages. And it is a distinction between the three contracts. They were interpreted differently by HUD. We were allowed to charge the more thorough search in Wisconsin and Minnesota. Okay, but the problem that you have it seems to me is that I do not see your complaint as raising this as a separate issue. And I do not see that the summary judgment papers raise this as a separate issue. That is the recovery for the more thorough title search. I would suggest that it at least appeared in my affidavit the distinctions between the two contracts. I think the complaint could have been clearer. Was it raised in connection with the summary judgment motion? I believe it was, but I cannot say that for sure. I did not make the summary judgment motion. The second part of the distinction that I raised in the beginning, the concern that was always raised from the beginning of the contract was that we would not be able to charge duplication of services, which is I think what the court is highlighting there where the search is different. But there is also a distinction between services charged for a closer, for a seller as opposed to the buyer. There is much more additional work that goes into charging for closing for buyers. Our understanding of the nature or basis for the dispute, and this is why I briefed it so extensively, there is a regional difference. In the West Coast, and we did business in California and Arizona, there is one closer that handles both sides of the transaction. The Midwest is clearly different than that. Two closers performing two separate functions are involved. That has always been my understanding of the nature of the dispute with HUD, originating in the Minnesota and Wisconsin contracts, as to why we could not charge the additional closing fees, which are required when putting together the lender's documents. Allison pointed out California and Arizona closers charge about three times more than in the Midwest because there is so much more work. And in our initial dealings with HUD, we were dealing with their California office. So that's always been my understanding of the nature of the dispute. I would like to comment just briefly on the Jowlett case, which the judge raised. There is one difference, I think, that was overlooked. I think the judge looked far too much at industry practice when the totality of circumstances needs to be considered. We aren't using industry practices to create an ambiguity here. I'm attempting to use industry practices to resolve the ambiguity. There's plenty of, in my reply brief, I went into some detail, going back to Corbin and Willis in the restatement. The importance of going beyond the literal reading of the contract, looking at exactly what the parties did and what they were discussing. The last point I want to highlight, I raised the RESPA issue. In the 1990s, I actually worked fairly closely with HUD on RESPA enforcement issues. In the state of Minnesota, HUD was investigating certain practices in Minnesota. I was doing the same as a private attorney. I brought two antitrust suits in Minnesota, representing Northwest Title, complaining of RESPA violations. I lost both cases. But HUD went in with their enforcement actions, and they won their cases. I can guarantee you that there's nobody in the state of Minnesota who, the real estate industry, would love to find a violation of a RESPA violation in me. And they would love to do that, especially in connection with the contract with HUD. We were always very, very concerned about violating RESPA. And the contention that we were supposed to be providing all these free services to buyers raises a serious RESPA issue in me. Whether or not we would lose, whether or not HUD would lose, really isn't the issue. The issue is we could have been sued, and there could have been significant liability. So that's why I raised that issue. If there's no questions, I can save my time for rebuttal. Thank you. We'll save you some rebuttal time. Ms. Tandem? Thank you, Your Honor. Let me tell you what the problem that I see here is. The government agrees that they could charge for title insurance, right? That's right. And they were allowed to charge for title insurance. But what I understand them to be arguing is that in order to write title insurance, we had to do a more thorough and costly title search. And that we should have been allowed to charge for that, but in at least one of these states, we were not allowed to charge for that. And if we can charge for the title insurance, why shouldn't we be allowed to charge for the extra title search that's necessary for the title insurance? That seems to me to be the argument. Whether it was raised below, that's another question. What's your response to that? I'll start by saying it wasn't raised below in the summary judgment brief that starts on page 856. There's no reference to title searches, and there's really no reference to what these additional costs above the cost of the physical closing were that Northwest title claims were not allowed to be charged in the three states. As for that additional title search that we're now hearing of, a title search is within the tasks that Northwest title was assigned by the contracts. The tasks are listed in section C-4-2 and C-4-3, and title search is among those. Yeah, but what they say is, yes, that's true, but there's different kinds of title searches, and that you have to do a more expensive and perhaps additional title search if you're going to get insurance. Is that true? I mean, I don't know. Your Honor, because we dealt with the amended complaint, its allegations, and the contractual language, we have not had discovery on the background of how title searches are conducted, whether a second title search would be necessary. In this case, HUD is the owner of a foreclosed home. It's hard to see why a second title search, after the first one conducted by Northwest title, would be necessary to confirm what was known very soon before the closing. In addition, the question of how HUD did not allow Northwest to make certain charges is something that I think would be handy for the court to know. The contracts point out that there's a quality assurance process at Section C-5-2, and HUD-1 settlement forms, an example is at Appendix 398, were submitted by Northwest title, and HUD reviewed a spot check of these type of forms to see the types of fees that were being charged, and in that spot check would notice that certain settlement closing costs were being charged to buyers when they shouldn't have been charged. And that's why there was a consistent interpretation, contrary to what Northwest title is arguing. The affidavits it attached to its summary judgment response from Mary Casper and John Lindle both say that soon after the Wisconsin and Minnesota contracts were entered into, Northwest title was contacted by HUD and told that it could not charge closing costs to buyers. And in addition, Mary Casper who worked for a contractor of HUD's said that she was instructed by HUD not to allow closing costs. Can I ask you a question about insurance, which I realize is not before us because there's no claim here about insurance, but I guess I want to understand how to read the contract, and in particular why the presence of the word insurance in the B4-1 list of things that they cannot charge for doesn't run counter to the argument that B4-1 and B4-2 are unambiguous. What other insurance could that be referring to? Section B4-1. Yeah, that's the principal B4-1 and B4-2 are the principal provisions that the Court of Federal Claims relied on to say unambiguously this bars the costs that they seek here. And it lists insurance. To be inclusive of all costs, including but not limited to all labor, supervision, fringe benefits, travel, subcontracts, other direct costs, overhead, general and administrative costs. It's a long paragraph. Right. In the last 15 words, 20 words. Title search costs and any licenses, insurance. Insurance, right. The red as a whole, the contract includes a statement that the buyer may obtain title insurance from any title insurance company. It chooses that the contractor Northwest title is to inform the buyer that it can purchase title insurance from any. It seems to me it's one thing to say red as a whole, you can see how the earlier provision doesn't actually contradict the later provision, the C whatever series. But I guess what I'm asking for is an explanation of how it doesn't, unless you're just saying the later provision overrides the earlier one, even though the earlier one on its face unambiguously bars this. The earlier provision saying that the unit price per closing is inclusive of all costs, including but not limited to, and it says here insurance. Right. And then the later provision just says you can buy from anybody, which doesn't on its face say including the party to this contract. And yet you allow that. I would read this because it's a separate section that says any and all licenses, insurance certificates, or permits as stated in section C, paragraph 412, section C, paragraph 412, which is at page 96 of the appendix talks about the license insurance certificates and permits that the contractor has to have. For example, a license. Liability insurance. I'm sorry. Liability insurance. Probably, Your Honor. Yes. A license to provide title insurance that would be granted by a state and the insurance, as it says here, required for the performance of the contract and comply with federal, state, county, municipal, and local laws. And so it's referring to the contractor would be our interpretation and their insurance necessary to perform their business. But section B41 is explaining that the costs of conducting a closing are being paid by the government. And the closing is primarily intended to provide services to a buyer. And Northwest Title in its amended complaint lists it. Why would that? I don't understand about the primarily. There are two parties to the transaction. Presumably they both benefit from the transaction or they wouldn't be entering into it. Why is the closing primarily one or the other? The physical closing allows the deed to be recorded, which is of primary importance to the buyer. It allows funds to be transferred from the buyer. That sounds like it's primarily for the benefit of the seller. Well, I will read from Northwest Title's amendment. Does it matter whether it's primarily or not? No, not really, Your Honor. We believe that the closing, which is what the government contracted for, is something that benefits both the buyer and the seller. And it was intended by HUD that there was an objective of selling homes in the manner that would promote home ownership, to obtain error-free closings, to have deeds properly recorded. And Northwest stated in its amended complaint that there were certain tasks that were the type provided to buyers by settlement service providers. And they were title searches, special assessment searches, career fees, wiring fees, recording fees, and fees for conducting the physical closing with the buyer during which the sale documents are presented, executed, notarized. That's at appendix 349 to 50 in paragraph 12. And those are part of Northwest's duties in sections C-42 and C-43. So the government is contracting to have closings conducted. And those closings, by doing that, the government is, as seller, is paying the buyer's closing costs it would otherwise pay. And section B-42 makes that clear that except as explicitly allowed in paragraph C-4422 below, the purchaser, lender, and or seller shall not pay any additional costs for closing services, including an additional lender fee. And as the trial court found, B-42 is a prohibition on the exact cost that Northwest title is seeking here. It's seeking to – Maybe, maybe not. I mean, I'm not sure that's true if there's an extra cost of title search to get insurance. The Northwest provided no evidence in response to the converted motion for summary judgment that would demonstrate that a title search was not – that a fee was not allowed by HUD. There is no evidence that can support its claim that it was damaged by the government not allowing that fee if that, in fact, happened. In fact, the bigger issue is that the contracts don't place a duty on HUD at any point to allow Northwest to charge fees, be it for closing costs or title insurance. Northwest has not demonstrated how the government can breach a duty in the contract when there is no duty to allow fees of this nature to be charged. You certainly agree that they had the right to charge for title insurance. There are statements in the contract that the buyer can choose to purchase title insurance or not. They can charge for title insurance, right? They can. So the question that they raise is, well, if we can charge for title insurance, shouldn't we be able to charge for an extra title search related to the title insurance? I mean, it's a perfectly reasonable position. Their problem is I don't see that they addressed this below. They did not, Your Honor. Again, as we see it, the claim is really they're claiming that they have a business relationship with the buyers and that the government has in some way interfered with that separate relationship, not that there's a duty in the contract to allow any charges to be made. As for Northwest's claims related to industry practice, the court explained in the Jowett decision that the appellant must identify an ambiguity in the contract in order to try to use industry practice to explain what a specific term, would be a term of art, means. And the plaintiff has never pointed to any specific word in the contract that it claims is ambiguous. Contrary to what the appellant's counsel said, the trial court did not rely on any industry practice. Instead, the trial court properly concluded that industry practice should not be used to create an ambiguity where there is none within the actual language of the contract. And Northwest has not argued that a seller never can pay a buyer's closing costs, and nor has it shown that it relied on a competing interpretation of any words within the contract when it entered into the contract. There's no evidence also in the record of any contracts with the buyer or the solicitation which the appellant has relied on. The trial court provided the appellant with an opportunity to provide evidence in response to our motion dismiss, which was converted into a motion for summary judgment of the contracts. And again, the conduct of the parties is also only considered if the contract is ambiguous, and here there is no ambiguity that's been demonstrated. Even if there were, HUD's conduct, contrary to the appellant's claim, is consistent with a note in two affidavits attached to their opposition to summary judgment that within a brief period after the contracts were signed, HUD informed Northwest Title that it could not charge closing costs. And for those reasons, we request that the court affirm the decision of the trial court, and if the court has no further questions. Thank you. Thank you. If I may just make a brief rebuttal. I'm not, I'm fairly certain I understand where the court is coming from on these issues, but I need to rebut the appearance that's given that somehow in these contracts that there are duties, you know, that merge the buyer and the seller under one agreement, and these are two separate duties. The contract was clearly always made for the benefit of representing sellers, and to take language and say, well, we're also supposed to do this for buyers because it's all part of the closing, I think that's getting a little bit sloppy as it relates to actual real estate practices where there is a clear line of demarcation as to what's done for the seller and what's done for the buyer. The contract reference had a concern about the buyers. They said two things. They said, make us look good and don't get us sued for violation of RESPA. And I can't overstate the concern regarding RESPA violations that if there's too much, that sellers do too much for the benefit of the buyer, that in this case would allow Northwest Title to collect title insurance fees because they basically were giving away the other fees. That would be a RESPA violation. The contract was never interpreted that way, and any clause that's interpreted that would require that should be stricken for being illegal or requiring an illegal act. So I think there's a real danger of getting everything too merged between duties of sellers and duties of buyers. We were always very clear on what we were supposed to do. The buyers were to be an entirely separate relationship, which we were encouraged to pursue so we could earn more fees. The discounting came later. I have nothing further to add. Thank you. Okay. Thank you. Thank you both. The case is taken under submission.